UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BOARD OF MANAGERS OF THE
EMPIRE CONDOMINIUM,

             Plaintiff,       :

     - against –          :

DAVIS & PARTNERS, LLC, RFR HOLDING LLC,  :
RFD THIRD AVENUE I ASSOCIATES LLC,
TREVOR DAVIS, ABY ROSEN, MICHAEL FUCHS,  :
WOLF MANAGEMENT & LEASING, LLC,
DAVIS CONSTRUCTION COMPANY, DAVID  :
LEVINE, H. THOMAS O'HARA ARCHITECT,
PLLC, SCHUMAN, LICHTENSTEIN,  :
CLAMAN & EFRON, COSENTINI ASSOCIATES,
LLP AND DeSIMONE CONSULTING ENGINEERS,  :

             Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

_____ CV

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, the Board of Managers of the Empire Condominium ("**Plaintiff**" or **the**

"**Board**"), on behalf of itself, the Empire Condominium ("**Empire**" or "**Condominium**") and

the residential unit owners of the Condominium, alleges as follows by its undersigned attorneys,

Fulbright & Jaworski L.L.P., for its Complaint herein:

### Nature of the Action

    1.     This action arises from the defendants' pattern of fraudulent and otherwise

wrongful conduct in among other things, their construction of, marketing and sale of residential

units in, the Empire.  The Empire building (**the "Building"**) was constructed beginning in or

around 1999, by a joint venture of defendants Davis & Partners, LLC ("**Davis Co.**") and RFR

Holding LLC ("**RFR**"), operating together through RFD Third Avenue I Associates LLC

("**Sponsor**"), an enterprise owned and controlled by Davis Co. and RFR.

    2.     Defendant Trevor Davis ("**Davis**") is a principal of Davis Co. and of the Sponsor.

Defendants Aby Rosen ("**Rosen**") and Michael Fuchs ("**Fuchs**") are principals of RFR and of

the Sponsor.  For purposes of this action, plaintiff refers to Davis, Rosen, Fuchs, Davis Co. and RFR collectively as the **"Developers."**

3.      Through their scheme to defraud described herein, Developers intended to and did obtain money and other property consisting of, among other things, purchase monies paid for residential units in the Empire, monies to be held in escrow pending issuance of a permanent certificate of occupancy for the Empire, electric power diverted from the Condominium to Developers' commercial units in the Building, and the monies that Developers would have had to expend, but did not expend, to perform their fraudulently made promises (i) to construct the "Building" according to applicable plans, specifications and quality standards and, (ii) later, to repair egregious defects in their construction of the Building.

4.      Upon information and belief, the Empire venture was extremely profitable for Developers, who collectively realized tens of millions of dollars from the Empire venture.

5.      The Developers' revenues and profits from the Empire venture derived in substantial part from a pattern of repeated falsehood, concealment, breach of contract, breach of trust and other wrongdoing, which have caused and continue to cause corresponding loss and damage to the Condominium and its residential unit owners.

6.      For example, controlling every aspect of the Empire's construction through defendant Davis Construction Co. (**"Davis Construction"**), which defendant Davis owns and controls, the Developers knowingly cut costs and corners in fundamental structural areas, including without limitation (i) roofing, (ii) masonry, (iii) insulation, (iv) electric work, (v) windows and doors, and (vi) heating, ventilating and air conditioning (**"HVAC"**). Inadequate materials and workmanship in these areas produced serious construction defects that have led to problems including repeated water leaks inside the Building, frigid indoor temperatures in winter, frozen and burst pipes inside apartments, sweltering indoor temperatures in summer, air, noise and dust infiltration, damage to interiors of residential and retail units and common areas, water saturation in and possible damage to the Building's façade, and lawsuits by residential and retail occupants.

7.     The Developers' construction of apartment and common area interiors in the Building fell far short of their advertised billing as "luxurious condominium residences finished to the most exacting detail," owing to the use of inadequate, low-quality materials and workmanship in insulation, windows, floors, paneling, kitchen countertops and cabinetry, wiring, plumbing and bathroom installations.  In these and other ways, the Developers knowingly failed to deliver the top-quality luxury building and residences they promised, attempted to shift Sponsor's construction costs to the Condominium and its residential unit owners, and caused property damage and financial and other loss to the Condominium and its residents.

8.     In marketing and selling residential units in the Condominium, the Developers knowingly and repeatedly misrepresented the condition and features of the Building in which they were selling residential units, and failed to disclose the foregoing construction defects and other problems.  The Developers repeatedly used the mail and interstate wires in carrying out their fraudulent scheme, and continue to use the mail and wires in their efforts to perpetuate the scheme and retain the fruits thereof.

9.     Through the foregoing acts and omissions, and others, all of which are described in greater detail below, (i) the Developers and certain other defendants have violated the Racketeer Influenced Corrupt Organizations Act (**"RICO"**), 18 U.S.C. § 1961 et seq., (ii) the Sponsor has breached its contractual obligations to the Condominium and residential unit owners, (iii) the Developers have violated N.Y. General Business Law §§ 349 and 350, (iv) various other defendants including Davis Construction and Wolf Management & Leasing LLC (**"Wolf Management"**), a company owned and controlled by Davis, have breached their contractual, fiduciary and other duties to the Condominium and its residential unit owners, and (v) the Developers and Sponsor have knowingly participated in such breaches of duty.

### Jurisdiction and Venue

10.     This Court has subject matter jurisdiction over the Empire's federal RICO claim pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the Empire's state-law claims pursuant to 28 U.S.C. § 1367.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2).

### The Parties

12.     Plaintiff, the Board of Managers of the Empire Condominium, has its principal office at the Condominium, and brings this action on its own behalf, on behalf of the Condominium, which is a condominium association organized and existing pursuant to Article 9-B of the N.Y. Real Property Law, and on behalf of the Condominium's residential unit owners pursuant to N.Y. Real Prop. L. § 339-dd and the Condominium's Bylaws. The Empire is located at 188 East 78th Street, New York, NY 10021.

13.     Defendant Davis Co. is a Delaware limited liability company with its principal office at 393 Fifth Avenue, New York, NY 10016. Among other things, Davis Co. is involved in the construction and development of residential rental and condominium buildings in New York City, often as a joint venturer with defendant RFR. Defendant Davis is a principal of Davis Co. and controls its operations.

14.     Defendant RFR is a New York limited liability company with its principal office at 390 Park Avenue, New York, NY 10022. Among other things, RFR is involved in the construction and development of residential rental and condominium buildings in New York City, often as a joint venturer with defendant Davis Co., and in the purchase and operation of commercial office buildings, such as Lever House and the Seagram Building. Defendants Rosen and Fuchs are principals of RFR, and together control its operations.

15.     Defendant Sponsor is a New York limited liability company with its principal office at 390 Park Avenue, New York, NY 10022. Defendants Davis, Rosen and Fuchs are principals of Sponsor and control its operations. Davis is Sponsor's Chairman of the Board.

Sponsor is and was the "Sponsor" of the Offering, as that term is defined in the Condominium Offering Plan for The Empire Condominium filed April 30, 1999 and amended from time to time thereafter (the **"Plan"**). Among other things, Sponsor was the limited liability vehicle through which the Developers constructed the Condominium and sold its residential units, purportedly pursuant to the Plan.

16.    Defendant Davis is a principal of defendants Davis Co., Sponsor, Davis Construction and Wolf Management. Davis has his principal office at 393 Fifth Avenue, New York, NY 10016. Davis was actively involved in the construction of, and offering for sale of residential units in, the Empire (the **"Offering"**) which commenced on or about April 30, 1999 pursuant to the Plan. Davis was a signatory of the Plan.

17.    Defendant Rosen is a principal of defendants RFR and Sponsor. Rosen has his principal office at 390 Park Avenue, New York, NY 10022. Rosen was actively involved in the construction of the Building and the Offering. Rosen was a signatory of the Plan.

18.    Defendant Fuchs is a principal of defendants RFR and Sponsor. Fuchs has his principal office at 390 Park Avenue, New York, NY 10022. Fuchs was actively involved in the construction of the Building and the Offering. Fuchs was a signatory of the Plan.

19.    Defendant Wolf Management is a New York limited liability company with its principal office at 7 Penn Plaza, New York, NY 10001. Wolf Management is a real estate and management firm and a licensed real estate broker. Defendant Davis owns Wolf Management and controls its operations. During the time Sponsor controlled the Condominium, Sponsor retained Wolf Management to a purported multi-year contract to serve as the Condominium's Managing Agent. The Board terminated Wolf Management as Managing Agent of the Condominium, effective February 28, 2002.

20.    Defendant Davis Construction is a New York corporation with its principal office at 393 Fifth Avenue, New York, NY 10016. Davis Construction is owned and controlled by defendant Davis, who is the Chairman of its Board.

21.     Defendant David Levine ("**Levine**") was, at all times relevant hereto, a vice-president of Davis Co., the president of Wolf Management, and was appointed by Sponsor to serve on the Condominium's Board.  Levine was a Board member from the inception of the Condominium through December, 2004.

22.     Defendant Schuman, Lichtenstein, Claman & Efron ("**SLC&E**") is, upon information and belief, an architectural firm with offices in New York, NY.  SLC&E was and is at all pertinent times the architect of record for construction of the Building.

23.     Defendant H. Thomas O'Hara Architect PLLC ("**O'Hara Architects**") is, upon information and belief, an architect or architectural firm with offices in New York, NY, that was retained by Sponsor in certain matters related to the Condominium.

24.     Defendant Cosentini Associates, LLP ("**Cosentini**") is an engineering firm having an office at 2 Pennsylvania Plaza, New York, NY  10022.  Cosentini was the mechanical engineer in the construction of the Building.

25.     Defendant DeSimone Consulting Engineers ("**DeSimone**") is an engineering firm having an office at 20 Waterside Plaza, New York, NY 10010.  DeSimone was the structural engineer in the construction of the Building.

26.     At all pertinent times, the Sponsor has been an enterprise engaged in, and the activities of which have affected, interstate and foreign commerce.

27.     At all pertinent times, the association-in-fact of each of the Developers – Davis, Rosen, Fuchs, Davis Co. and RJR – in the unincorporated entity known as RJR/Davis, which Developers have held out as the developer of real estate projects including the Empire, Impala, Seville, 425 Fifth and Park Avenue Place, has been an enterprise engaged in, and the activities of which have affected, interstate and foreign commerce.

**Facts Relating to All Claims**

**I.    THE DEVELOPERS' CONSTRUCTION OF THE BUILDING
         AND SALE OF RESIDENTIAL UNITS.**

28.    Since the mid to late 1990's, through their respective companies Davis Co. and RFR, defendants Davis, Rosen and Fuchs have collaborated on the construction and development of at least ten residential buildings in Manhattan.  Of those buildings, five have been rental buildings and five have been condominiums.  The Empire was the first condominium building developed by the Developers in Manhattan.  Following the Empire, the Developers have collaborated on other residential condominium construction projects including, without limitation the buildings known as 425 Fifth, the Seville and Park Avenue Place.

29.    The Developers' collaboration on the construction and sale of residential condominium projects has at all pertinent times been an association-in-fact, which the Developers have held out to the public and the real estate industry as **"RFR/Davis."**

30.    The Plan and promotional materials for the Empire touted the personal involvement of the Developers in the Empire project and their experience in developing and constructing other prestigious, luxury buildings.  Among other things, the Plan stated that Davis, Rosen and Fuchs would be "actively involved in this offering," and described various other development and construction projects in which the Developers had been involved.  Promotional literature for the Empire prominently displayed the RFR/Davis logo.  The combined RFR/Davis website (www.davisandpartners.com) displayed and continues to display the Empire as one of the buildings in the Developers' "Condominium Development Portfolio."  In these ways, among others, the Developers have acknowledged their direct role in the construction and sale of the Empire Condominium, and have made the so-called "RFR/Davis quality signature" a centerpiece of their marketing efforts for the Condominium units.

31.    Construction of the Empire began in or around 1999.  Construction was plagued by a series of problems related to faulty work and materials, which substantially delayed the Building's opening.  The Developers and Sponsor were aware of such problems and were

responsible for their existence. Among other things, in or around February 2000, the Developers and Sponsor replaced the initial construction manager and/or general contractor, HRH, with Davis Construction, which the Developers owned and controlled. Davis Construction performed, supervised and/or approved the faulty work that led to the building defects complained of herein.

32.    Through Davis Construction and their own active involvement in the Empire project, the Developers and Sponsor had knowledge and notice of those defects during the period they were selling residential Condominium units. Developers and Sponsor admitted the defects and their knowledge thereof in writing in numerous court documents filed by Developers in response to lawsuits by contractors and subcontractors seeking payment for their work on the Empire.

33.    The Developers began selling residential units in the Empire through the Sponsor on or about April 30, 1999, the date the Condominium Offering Plan was filed. The Sponsor declared the Plan effective on or about March 2, 2000, following Sponsor's receipt and acceptance of contracts for the purchase of 71% of the Condominium's residential units. The first closing of a residential unit sale occurred on or about November 9, 2000.

34.    At the time unit sales began, and for many months thereafter, the Building had not been constructed and the units being sold were not available for inspection by their prospective buyers. Accordingly, most if not all persons who contracted to buy Empire apartments from the Sponsor did so in reliance on descriptions in the Plan, promotional materials of the Sponsor and Developers, other oral and written representations of the Sponsor, its sales agents or attorneys, and inspections of a model apartment made available by the Developers in another of their buildings.

35.    Sponsor continued to offer residential units in the Condominium for sale to the public pursuant to the Plan through at least May 10, 2002.

## II.    THE DEVELOPERS' AND SPONSOR'S REPRESENTATIONS AND PROMISES ABOUT THE BUILDING AND ITS RESIDENTIAL UNITS

36.    According to the Plan and the Developers' advertisements and promotional materials, the Empire was to consist of "luxurious condominium residences," which would provide residents with "a new level of luxurious living on Manhattan's Upper East Side," within "a privileged world of luxury and security." Prospective buyers were promised residences "finished to the most exacting detail," including "hardwood floors," gourmet kitchens with granite countertops and maple cabinetry, and marble bathrooms offering a "spa-like refuge in which to pamper your every need."

37.    The Developers caused advertisements making the above-quoted claims to be placed in newspapers such as The New York Times. One such ad appeared in the Real Estate Section of The New York Times on August 5, 1999 and provided a telephone number by which to contact the Developers' Sales Office. The Developers' website also displayed a telephone number for the Sales Office.

38.    The Developers maintained a Sales Office for the Empire, and later for the Developers' other projects, at various locations near the Empire, including East 82nd Street. The Sales Office was staffed with sales personnel who received telephone calls from and placed telephone calls to prospective buyers, met with prospective buyers in person, and mailed prospective buyers the Plan, amendments to the Plan, and promotional brochures containing the statements quoted here. Upon information and belief, thousands of such calls, faxes and mail transmissions took place to and from the Sales Office during the approximately 2-years during which Sponsor was selling residential units in the Condominium. Upon information and belief, based upon, among other things, the interstate and international circulation of The New York Times, the worldwide availability of Developers' website, and the high level of public interest in the Offering, many such calls, faxes and mail transmissions took place across state or national boundaries.

39.     Apartments in the Empire were priced by the Developers and Sponsor to reflect their advertised premium status. Initial prices in 1999 ranged from $640,000 for a one-bedroom with no balcony to $4.15 million for a three-bedroom with terrace. The Sponsor's offering prices increased over time with top prices ultimately exceeding $4.5 million and $1700 per square foot. Whether viewed alone or in conjunction with the lavish descriptions in the Developers' promotional materials, these prices represented that the Empire and its apartment residences would be constructed using the highest quality materials and workmanship.

40.     According to the Plan, the Sponsor was responsible for completing the construction of the Condominium in accordance with the architects' plans and specifications. In the Plan, the Sponsor made the following continuing representations and covenants, all of which were false when made to prospective buyers and ultimate residential unit owners, and were otherwise breached, as described in greater detail below:

a.   "Construction of the Building, including the individual Units and Common Elements, will be completed substantially in accordance with the plans and specifications, and all applicable Laws."

b.   "Sponsor will perform such work and supply such materials, or will cause the same to be performed and supplied, as is necessary in order to complete the construction of the Building with a quality of construction comparable to the currently prevailing local standards . . . ."

c.   Sponsor "represents that it has no knowledge of any material defects or need for major repairs to the Building except as set forth in the Description of Property and Building Condition and Specifications . . ."

d.   "The Plan does not knowingly omit any material fact or knowingly contain any untrue statement of any material fact."

e.   The R-value of the exterior walls is 15.42.

f.    Apartments will be equipped with heating systems able to "maintain a temperature of 72°F inside when the outside temperature is +15°F."

g.   Apartments will be equipped with air conditioning systems "capable of maintaining inside conditions of 78°F and 60% relative humidity when outside temperatures are 89°F F.W.B."

h.   "Electric service will be metered directly from Consolidated Edison to each Residential Unit and to each of the Commercial Units."

i.   "Sponsor and its principals have no affiliation with the Attorneys, the Selling Agent, the Budget Expert, the Construction Professionals, or any person or firm who will provide services to the Condominium subsequent to the First Closing."

41.   The accuracy, completeness and reasonableness of the Plan was investigated by Davis, Rosen and Fuchs, each of whom certified in writing that, among other things, the Plan's contents were complete, current and accurate, did not and would not omit any material fact, contain any untrue statement of material fact, or contain any deception or concealment.

## III.   THE FALSITY OF THE DEVELOPERS' REPRESENTATIONS, AND THE BREACHES OF SPONSOR'S COVENANTS.

42.   Each of the representations set forth in ¶¶ 36-41 above was false when made by the Developers to prospective and actual buyers of Condominium units.  The Developers knew the representations to be false, and intended thereby to defraud buyers of residential units pursuant to the Plan.  The foregoing promises were breached by the Sponsor in connection with each sale of a residential unit pursuant to the Plan.

### A.   Construction Defects

43.   As conducted and overseen by the Developers, through Davis Construction and otherwise, construction of the Building was egregiously deficient and incomplete in numerous respects that (i) diverge materially from the plans and specifications for the Building; (ii) diverge materially from the Plan; (iii) diverge materially from local construction standards; (iv) violate applicable provisions of local building and fire codes; (v) diminish the usefulness and security of the Condominium's common areas; (vi) diminish the usefulness, habitability and value of the Condominium's residential units; (vii) have caused physical damage to the Condominium's

common areas, residential units and commercial units; and (viii) have increased the costs to residents and Plaintiff of living in and operating the Building.  Specifically, among other things,

44.    Basic work necessary to maintain comfortable, even habitable, temperatures within the Building was never performed.  Among other things:

a.    Substantial amounts of insulation required by the plans and specifications were never installed, and substantial areas of the Building's exterior walls and interior plumbing have no insulation whatsoever.  The absence of insulation was obvious during construction of the Building, and was concealed by the installation of interior walls.  The R-value of the exterior walls was not 15.42.

b.    Windows and doors throughout the Building were improperly installed, so as to allow substantial air, soot and noise infiltration into residential apartments and common areas.  Those defects were visible and otherwise apparent to Developers, Sponsor and construction professionals during construction of the Building.

c.    Inadequately sized heating/cooling units were installed in individual apartments.  The units were not capable of heating apartments to 72°F or cooling apartments to 78°F as promised in the Plan.

d.    The heating and air conditioning system serving certain common areas of the Building was improperly installed and was non-functional for more than a year after the Building was first occupied.  The non-functionality of the system was known to the Developers and Sponsor.

45.    Because of the foregoing, apartments and common spaces in the Building have suffered and continue to suffer frigid temperatures (often below freezing) in winter and hot, humid temperatures in summer.  Areas within common spaces and individual apartments have been unusable due to frigid temperatures.  Pipes have frozen and burst, causing water damage. Floors have warped and buckled, requiring replacement.  Building residents have been forced to expend substantial funds (e.g., electric bills exceeding $900 per month) in efforts to maintain

habitable temperatures.  The Board has expended substantial funds on engineering and other

consultants, in efforts to identify and remedy the sources of these problems.

46.     Work necessary to keep the Building watertight was not properly performed.

Among other things:

        a.     Improper roofing materials (such as flashing) were used.

        b.     Defective workmanship visible to construction professionals (e.g., open

caulking joints, open counterflashing joints, missing fasteners, improperly sealed joints

and seams, improperly sealed insulation and mechanical equipment, improperly detailed

steel penetrations into parapet walls, exposed holes in brickwork, missing kick plates and

drip edges, unfinished coping stones, uncaulked coping stone joints, inward-sloping

window sills) was employed in installing roofing systems and performing masonry work.

47.     Because of the foregoing, the Building has experienced numerous water leaks into

its residential and commercial spaces, and behind its exterior walls.  The Condominium's

residents have experienced water damage to their apartments, and its commercial tenants have

experienced water damage to their stores or offices.  One such tenant has sued the Condominium

and Developers because of such damage, exposing the Condominium to legal fees, substantially

increased insurance costs and potential liability, and jeopardizing the Condominium's continuing

ability to obtain insurance.  The Building's façade and other masonry have experienced water

saturation and resulting damage, such as cracks, spalling, efflorescence, vegetation growth and

water stains, which require immediate repairs and may experience additional related failures in

the future.

48.     Numerous windows in residential units were improperly chosen and/or installed

in ways that prevent them from being used as designed.  Where sprinklers are required by law to

be installed inside the Building, the sprinklers and windows were installed, contrary to the plans

and specifications for the Building, so that the sprinklers prevent the windows from being

opened as designed for purposes of cleaning their exterior glass surfaces.  To avoid this problem,

different windows should have been installed, which could be opened without contacting the sprinklers, or the sprinklers should have been installed above the window frames.

49.    Because of these construction defects, residents cannot clean their windows from inside their apartments, as the windows are designed to be cleaned, and the Condominium must incur the cost of hiring professional window cleaners to hang scaffolding and clean the Building's windows from the outside.  As shown in part by the absence of rooftop fixtures for hanging scaffolding, and the absence of window cleaning expenses in the Plan's projected operating expenses for the Condominium, such external window cleaning was not contemplated in designing the Building.  The Condominium's current resulting window cleaning expenditures are approximately $24,000 per year.

50.    Steel penetrations (e.g., pipe, electric, mechanical and vent) and fire doors inside the Building were installed with visible defects that violate applicable building and/or fire codes.

51.    Installation of mechanical and electronic security systems serving the Condominium's common areas was never completed as called for in the Building's plans and specifications.

52.    Electrical wiring in the Condominium's common areas and residential units was improper and incomplete.  Electrical outlets were installed without covers, or were never connected to electric current.  Electric conduits were left improperly exposed.  Telephone wiring within residential units was performed improperly and was corrected by residents at their own expense.

53.    Flooring installed in the residential units, advertised as "hardwood," was in fact laminate flooring, which has a substantially shorter useful life than hardwood, and cannot be sanded or refinished.  The laminate flooring is low-quality, and inconsistent with the Developers' advertisements of "luxurious condominium residences finished to the most exacting detail." Installation of such laminate flooring was in many instances performed defectively, with the result that floors have buckled, warped and come apart, necessitating replacement.  In addition,

the concrete slabs underlying the flooring were defective in many instances, impeding proper installation of any wood or laminate flooring and leading to the problems described herein.

54.     Kitchen cabinetry installed in the residential units, advertised as "maple," was in fact largely melamine, comprised of a composite material bonded to chipboard.  The melamine cabinetry is low-quality, and inconsistent with the Developers' advertisements of "luxurious condominium residences finished to the most exacting detail."  The melamine cabinetry has already experienced numerous failures, including loosened hardware, cracked/spalled segments around hinges, and warped doors and panels.

55.     Kitchen countertops in residential units consisted in many instances of mismatched pieces of granite, with cracks, chips and open seams.  Such countertops are low-quality, and inconsistent with the Developers' advertisements of "luxurious condominium residences finished to the most exacting detail."

56.     Other construction defects evident to construction or real estate professionals from visible existing conditions in the Building are noted in the Physical Condition Survey of Rand Engineering, P.C. (**"Rand"**) dated February 14, 2003 (**"Rand Report"**).  In addition, the Rand Report notes possible additional defects that can only be ascertained through special probing and/or testing, now that underlying conditions have been concealed by interior structures.  All such additional defects are among the matters complained of herein.  Without acknowledging that the Rand Report is a complete statement of the construction defects in the Building, many of which were concealed at the time the Report was prepared, Plaintiff incorporates it by reference.

**B.     Sponsor's and Developers' Failure and Refusal to Pay Subcontractors**

57.     One method by which Developers have carried out their fraudulent scheme was consistently failing and refusing to pay contractors and consultants for work and materials supplied in the construction of the Building.  Typically, as shown by court papers in numerous lawsuits filed by subcontractors on the Empire and other projects, the Sponsor and/or Davis

Construction, as directed and controlled by Davis and the other Developers, failed to make timely and full payments to subcontractors while their work was in progress and then refused to make full payment when the work was allegedly complete. Disputes and lawsuits followed, resulting in settlements pursuant to which the subcontractors consistently accepted substantially less than the contract price for their work.

58. ' By causing Sponsor and/or Davis Construction to withhold payment from subcontractors, Developers reduced their costs and increased their profits from the Empire project. Such additional profits came at the expense not only of subcontractors, but of persons who came to purchase Condominium units. Such persons invested in apartments and a Building made defective by subcontractors who were financially unable, because they were not being paid, to supply the labor and materials required to comply with the plans and specifications.

59. At all pertinent times, Developers knew, from their experience in the construction field, that their failure and refusal to pay subcontractors would naturally result in defective work on the Building. Developers intended this natural consequence of their intentional acts.

60. The Developers' pattern of the failing and refusing to pay subcontractors is shown in part by the following lawsuits brought against Sponsor, Developers and/or Davis Construction by contractors and consultants seeking payment for their work on the Empire and Developers' other projects:  *Awad Architects Models Inc. v. Davis & Partners LLC, 0115116/2000 (Sup. Ct. N.Y. Co.);[1] *Davis Construction Co. v. H&H Woodworking, Index No. 103526/02 (Sup. Ct. N.Y. Co.);*Exterior Wall & Building Consultants, Inc. v. Davis Construction Co., 0124427/2001 (Sup. Ct. N.Y. Co.); *Ice Cap, Inc. v. Davis Construction Co., 0602821/2002 (Sup. Ct. N.Y. Co.); *Premier New York, Inc. v. Davis Construction Co., 0119173/2001 (Sup. Ct. N.Y. Co.); *R&J Construction v. RFD Third Avenue I Associates LLC and Davis Construction Co., 0018791/2003 (Sup. Ct. Nassau Co.); *S.J. Electric, Inc. v. Davis Construction Co., 0604934/2001 (Sup. Ct. N.Y. Co.); *Spectrum Kitchens v. Davis et al., 0005141/2001 (Sup. Ct.

---

[1] Cases marked with an asterisk concern the Empire.

Nassau Co.); A&E Consultants of N.Y., Ltd., v. Davis Construction Co., 0124426/2001 (Sup. Ct.
N.Y. Co.); Allsafe Consultants, Inc. v. Davis Construction Co., 0124425/2001 (Sup. Ct. N.Y.
Co.); Allsafe Consultants, Inc. v. Davis Construction Co., 0124429/2001 (Sup. Ct. N.Y. Co.);
American Industries Corp. v. Wellington Tower Assocs., L.P., 0122851/1999 (Sup. Ct. N.Y.
Co.); Capability Marble & Granite Co. v. 300 East 64th Street Associates, L.P., 0103405/1998
(Sup. Ct. N.Y. Co.); Coordinated Metals v. Davis Construction Co., 0119904/2003 (Sup. Ct.
N.Y. Co.); Coordinated Metals, Inc. v. Davis Construction, Inc., 0115954/2003 (Sup. Ct. N.Y.
Co.); Fujitec Serge of N.Y. v. RFD 425 Fifth Avenue LLC, 0106634/2003 (Sup. Ct. N.Y. Co.);
Fujitec Serge of N.Y. v. RFD Second Avenue LLC, 0106635/2003 (Sup. Ct. N.Y. Co.); Heritage
Air Systems, Inc. v. Davis & Partners LLC, 0601636/2003 (Sup. Ct. N.Y. Co.); L&L Painting,
Inc. v. Davis Construction Co., 0604060/2001 (Sup. Ct. N.Y. Co.); Leeds Painting & Decorating
Corp. v. Davis Construction Co., 0120461/1999 (Sup. Ct. N.Y. Co.); LVC Interiors, Inc. v. Davis
& Partners, LLC, 0101629/2004 (Sup. Ct. N.Y. Co.); M.H. Kane Construction, Inc. v. Davis
Construction Co., 0119723/2001(Sup. Ct. N.Y. Co.); MBMA Corp. v. Davis, et al.,
0009364/2001 (Sup. Ct. Nassau Co.); MBMA Corp. v. Impala Associates, 0116315/2001 (Sup.
Ct. N.Y. Co.); Metro Masons, Inc. v. RFD 425 Fifth Avenue LLC, 0105795/2004 (Sup. Ct. N.Y.
Co.); Metro Masons, Inc. v. RFD Second Avenue LLC, 0100413/2003 (Sup. Ct. N.Y. Co.);
Regional Scaffolding & Hoisting Co. v. Davis & Partners, LLC, 0100808/2002 (Sup. Ct. N.Y.
Co.); Robert Half International, Inc. v. Davis & Partners LLC, 0123283/2001 (Sup. Ct. N.Y.
Co.); Robert K. Futerman Associates, LLC v. RFD 425 Fifth Avenue, L.P., 0109944/2004 (Sup.
Ct. N.Y. Co.); Tishman Construction Corp. v. RFD 425 Fifth Avenue LP, 0112122/2003 (Sup.
Ct. N.Y. Co.); Tishman Construction Corp. v. RFD Second Avenue, LLC, 0602038/2003 (Sup.
Ct. N.Y. Co.).

61.     At no time during their sales of residential units in the Condominium did Sponsor
or Developers disclose their practice of failing and refusing to pay subcontractors for
construction work on the Building, the subcontractors' resulting claims and liens, or the resulting

defective and incomplete work of which the Developers complained in response to such claims and the Board complains herein.

62.     The Developers' failure to disclose these facts rendered false and misleading the statements set forth in ¶¶ 36-41, above.

### C.     Sponsor's Affiliation with Construction Professionals

63.     ᐟ Contrary to its representation in the Plan, Sponsor was affiliated through common ownership and control with a Construction Professional that rendered services to the Condominium subsequent to the First Closing.  That entity was Davis Construction, which supervised and/or performed construction work on the Building both before and after the First Closing in November 2000.

64.     Sponsor and Developers knew of the Sponsor's affiliation with Davis Construction, but failed disclose it to prospective purchasers by amending the Plan or otherwise.

65.     In misrepresenting and concealing the facts of Sponsor's affiliation with Davis Construction, Developers and Sponsor intended to further their fraudulent scheme to foist a defectively constructed Building on purchasers of residential units in the Condominium.

### D.     Diversion of Electricity from Residential Units to Commercial Unit

66.     Acting through Davis Construction, the Developers and Sponsor caused electric power for one of the retail spaces owned by the Sponsor to be tapped from the electric panel serving the Condominium's common areas.  Thus, the Developers and Sponsor constructed the Building in such a way that the Condominium was paying for electricity supplied to the retail tenant, rather than installing a separately metered electric supply as required by the Plan.

67.     The foregoing rendered false the Plan's representations concerning the supply and metering of electricity to the Condominium's commercial units, and breached the Sponsor's corresponding contractual obligations to purchasers of the residential units.

### E.   Knowledge, Purpose and Intent of Sponsor and Developers

68.   The fraudulent purpose and intent of Developers in misrepresenting and omitting to state material facts as alleged above was, among other things, (i) to induce persons to purchase residential units in the Condominium at premium prices from Sponsor, in the belief they were purchasing interests in a new, luxurious building of high-quality construction, which would not require substantial repairs for many years, when in fact they would be buying interests in a building that was rife with hidden construction defects, and apartments that barely provided shelter from the elements, much less "a privileged world of luxury and security," (ii) to shift to the Condominium construction costs that were obligations of the Sponsor, (iii) to maximize Developers' proceeds from the Empire project, so Developers could reinvest such proceeds in their other New York City real estate ventures, including without limitation 425 Fifth Avenue, the Impala, the Seville, and Park Avenue Place.

69.   Developers' fraudulent intent is shown by, among other things, their knowledge of the facts alleged above, and their simultaneous marketing and sale of residential units pursuant to representations and promises that were made false and misleading by those facts.

70.   At all pertinent times, Sponsor and Developers had knowledge of the construction defects and other problems.  Sponsor and Developers obtained such knowledge through, among other things, their direct involvement in developing the Empire through their joint venture, and their participation in and supervision of the construction process via Davis Construction, which Davis owned and controlled.

71.   Sponsor and Developers also obtained knowledge of the construction defects through their supervision of subcontractors working on the Building, and through their repeated failure and refusal to pay subcontractors as a means of doing business.  Davis Construction was responsible for all payments and non-payments to subcontractors.  As admitted in an affidavit in the action Spectrum Kitchens v. Davis et al., 0005141/2001 (Sup. Ct. Nassau Co.), Davis himself made all payment decisions.  His actions and knowledge are attributable to his company,

Developer Davis Co., and to the other Developers, Davis's co-venturers Rosen, Fuchs, and RFR, with whom Davis shared offices and whom, together with Davis, the RFR/Davis website described as the "Team Extraordinaire."

72.      Sponsor and Developers have admitted the Building's construction defects and their contemporaneous knowledge thereof in their court filings in the following actions, among others:

      a.      Exterior Wall & Building Consultants, Inc. v. Davis Construction Co., 0124427/2001 (Sup. Ct. N.Y. Co.) (admitting that work of subcontractor was defective and negligent);

      b.      Ice Cap, Inc. v. Davis Construction Co., 0602821/2002 (Sup. Ct. N.Y. Co.) (admitting that heating and air conditioning units sold by subcontractor were defective and that its installation work was negligent);

      c.      Premier New York, Inc. v. Davis Construction Co., 0119173/2001 (Sup. Ct. N.Y. Co.) (admitting that work by roofing and sheet metal subcontractor was defective and substantially incomplete, and that Davis Construction "continually advised" the subcontractor of the defects in its work);

      d.      R&J Construction v. RFD Third Avenue I Associates LLC and Davis Construction Co., 0018791/2003 (Sup. Ct. Nassau Co.) (admitting that subcontractor failed to install insulation behind walls of Building, to perform insulation and vapor seal work on bathroom showers in Building apartments; admitting that Sponsor and Davis Construction notified subcontractor of defective and incomplete work prior to June 28, 2001);

      e.      S.J. Electric, Inc. v. Davis Construction Co., 0604934/2001 (Sup. Ct. N.Y. Co.) (admitting that subcontractor failed to provide and maintain skilled manpower on the Empire project, performed defective and incomplete work that caused delays and affected Sponsor's sale of Condominium Units; admitting that Sponsor and Davis Construction notified subcontractor in writing of incomplete, defective and rejected work

at least as early as December 2000; admitting that, as a result incomplete work, Sponsor and Davis Construction have been unable to obtain a final certificate of occupancy for the Building);

     f.    Spectrum Kitchens v. Davis et al., 0005141/2001 (Sup. Ct. Nassau Co.) (admitting that kitchen cabinets delivered by subcontractor failed to meet specifications);

     g.    Davis Construction Co. v. H&H Woodworking, Index No. 103526/02 (Sup. Ct. N.Y. Co.) (admitting that custom millwork and other woodwork in lobby and other areas of Building was defective, unacceptable and incomplete).

73.    Developers acknowledged to The New York Times in or around October 2001 that the Empire had been plagued by a series of construction problems that delayed its opening for more than a year, and that there had been substantial faulty work.

74.    At all pertinent times, Sponsor and Developers continued to sell residential Condominium units by misrepresenting the condition of the Building and concealing material facts concerning its construction defects and other matters described above. At no time did Sponsor or Developers cause the Plan to be amended to disclose the defects of which the Board complains herein, and of which Developers themselves complained in actions such as the above.

**F.    The Developers' Profits From Their Fraudulent Scheme**

75.    Upon information and belief, based upon newspaper reports that the Empire would cost the Developers $75 million to construct (New York Times, July 23, 1999), and upon the initial total offering price of approximately $175 million (before subsequent price increases) for residential and storage units in the Condominium, Sponsor and Developers realized as much as $100 million of profits from their Empire project. This figure does not include revenues that Sponsor has received and continues to receive through its ownership and operation of the Condominium's commercial units. Nor does it include additional amounts that Sponsor and Developers realized through their practice of failing and refusing to pay the contract price to subcontractors for their work on the Building.

76.     Upon information and belief, RFR/Davis Developers have reinvested substantial portions of those profits in their subsequent real estate ventures in New York City, including without limitation 425 Fifth Avenue, the Impala, the Seville and Park Avenue Place.

## IV.     CONVERSION OF ESCROW FUNDS.

77.     Pursuant to the Plan, Sponsor was obligated to, and did, place in escrow approximately $1,350,000 received pursuant to Purchase Agreements for residential units (the **"Escrow"**).  The purpose of the Escrow was to secure the performance of work necessary for the Condominium to receive a permanent certificate of occupancy.

78.     The funds held in the Escrow were for the benefit of the Condominium, and the Condominium had a resulting property interest therein.

79.     Pursuant to the Plan, the amount of the Escrow could be reduced and excess amounts released to the Sponsor, pursuant to certificates submitted by Sponsor's architect, defendant O'Hara, stating that lesser amounts were required to obtain a permanent certificate of occupancy for the Condominium.

80.     On various occasions, at the instance of Sponsor and Developers, defendant O'Hara, submitted certificates to the Escrow agent, pursuant to which the Escrow was reduced and the excess funds released to the Sponsor.  Upon information and belief, based on the ordinary manner of doing business, Sponsor and Developers caused O'Hara to submit such certificates by mail.  As a result of such certificates, no more than $35,000 of the original $1,350,000 remains in escrow to complete work necessary to obtain a permanent certificate of occupancy for the Condominium.

81.     At all pertinent times, as Sponsor and Developers knew and O'Hara knew or should have known, the construction defects described above would prevent issuance of a permanent certificate of occupancy for the Building, and more than $1,350,000 would be required to remedy such defects.  Even at this late date, construction of the Building is incomplete and nonconforming to the plans and specifications, and the Building lacks a

permanent certificate of occupancy.  Accordingly, the certificates were false and the Escrow

funds were released improperly to Sponsor.

82.     The conversion by Sponsor of funds from Escrow as described above was a

further manifestation of Developers' fraudulent scheme to obtain money and other property

through construction of the Building and sale of Condominium units.

V.     **DEVELOPERS' FRAUDULENT COURSE OF CONDUCT TO**
       **PERPETUATE THEIR SCHEME AND PRESERVE**
       **THEIR ILL-GOTTEN GAINS**

83.     The construction defects described herein first became manifest to Building

residents in 2001, the first year of their residence, when they experienced leaks and freezing

temperatures in their apartments and common areas of the Building.  After residential unit

owners gained representation on the Empire's board of managers in October 2001, the board

promptly brought the problems to the attention of the Sponsor, which Developers owned and

controlled.

84.     Rather than move promptly to correct the problems, which would have been the

response of honest businesspersons, Developers embarked on a course of conduct to delay and

ultimately avoid responsibility for necessary repairs.

85.     For a period of approximately 30 months – during which the Building's residents

suffered in their homes from extreme temperatures, leaks and damage, drafts, dirt and noise,

among other things – Developers and Sponsor engaged the Empire in lengthy negotiations

toward a purported settlement.  The negotiations were conducted under the auspices of the New

York Attorney General's office, pursuant to its authority under New York's Martin Act.  During

the lengthy period of negotiation, Developers and Sponsor refused to repair any of the egregious

defects in the Building.

86.     Unbeknownst to Plaintiff and the Attorney General, the Developers, through

Sponsor and Davis Construction, had agreed *already* with Building subcontractor R&J

Construction ("**R&J**"), in or around June 2001, that Sponsor and Davis Construction would

remedy the shower insulation work, batt insulation work, and other work that Sponsor and Davis

Construction had alleged was defectively and incompletely performed by R&J.  In return, R&J

agreed to certain holdbacks from its payment demands under its subcontract.

87.     Sponsor never advised the Board that Davis Construction had already agreed with

R&J to perform much of the work for which Sponsor was seeking additional consideration from

the Board.  Had the Board been aware of that fact, it would not have granted concessions for

such work, but would have insisted that Sponsor and Davis Construction perform their repair

obligations immediately.  By not disclosing those obligations, Developers deceived the Board

and the Attorney General into accepting a settlement that was worth considerably less than

Developers represented.

88.     Moreover, in a subsequent lawsuit by R&J, demanding release of the holdback

monies because the remedial work had not been performed, Developers, through Sponsor and

Davis Construction falsely represented in writing that they had been unable to obtain access from

the Condominium to perform the remedial work required by their agreement with R&J.  The

writing was served by mail.  In fact, the Sponsor never sought such access.  Had the Developers

and Sponsor advised the Board that they wished to remedy certain of the Building's defects

pursuant to the contract with R&J, the Board would have arranged the necessary access.

89.     Notwithstanding the preexisting obligations of Sponsor and Davis Construction to

perform much of the remedial work immediately, Sponsor delayed all such work until after its

execution of a Settlement Agreement with the Board in September 2003 (the **"Settlement**

**Agreement"**).  In the Settlement Agreement, Sponsor agreed to perform substantial remedial

work on the Building, including all the work specified in the Rand Report, which in turn

included the work required under Sponsor and Davis Construction's prior agreement with R&J.

The Settlement Agreement required that the Sponsor complete all window, water infiltration and

insulation work by February 16, 2004, and all other remedial work by June 15, 2004.

90.     The Developers were not signatories to the Settlement Agreement.  Rather,

Developers caused Sponsor to enter the Settlement Agreement in order to absolve themselves

from liability and expense for the problems they had knowingly caused, and to preserve their ill-gotten gains from fraudulent sales of residential units in the Empire.

91.     Like the agreement with R&J, the Settlement Agreement was a continuation of Developers' ongoing fraudulent scheme to obtain and retain monies from the construction and sale of the Building. At the time they caused Sponsor to enter the Settlement Agreement, Developers knew that Sponsor lacked the financial and other resources necessary to perform its obligations thereunder. Developers never intended to furnish Sponsor with the resources to substantially complete the work required by the deadlines specified, or to complete it at all. Rather, Developers planned to wear the Condominium down through incessant delays, token and ineffective repair efforts, and repeated disputes over the scope of work required. Developers planned for Sponsor to declare its obligations at an end without having made the required repairs, once again cheating the Empire and its inhabitants.

92.     Developers have carried out their plan expertly from September 2003 through April 2005, the date of this Complaint, which is many months after remedial work under the Settlement Agreement was to be complete. Initially, because Sponsor did in fact lack the ability to perform its repair obligations under the Settlement Agreement, Developers assured Plaintiff that Davis Construction would carry out the repairs on behalf of Sponsor.

93.     Thereafter, Developers caused Davis Construction merely to go through the motions by sending understaffed work crews to the Building to perform defective work at a snail's pace. Later, in lieu of performing the work through Davis Construction, Sponsor promised to fund the repairs by depositing monies in escrow to be paid to contractors hired by Rand. Those promises went unfulfilled, and the repairs remain unperformed.

94.     To the extent Sponsor and Davis Construction hired subcontractors to perform remedial work under the Settlement Agreement, they continued to engage, under the direction and control of Developers, in the same practice of nonpayment that characterized the initial construction of the Building and led to the initial construction defects. Developers even periodically failed to pay Rand, the engineering firm specified in the Settlement Agreement to